**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANUP SHRESTHA,
                              *Petitioner,*

              v.

ERIC H. HOLDER JR., Attorney
General,
                              *Respondent.*

No. 08-74751

Agency No.
A079-811-128

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted December 10, 2009*
Seattle, Washington

Filed January 5, 2010

Before: Ronald M. Gould and Richard C. Tallman, Circuit
Judges, and Roger T. Benitez,** District Judge.

Opinion by Judge Gould

---

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable Roger T. Benitez, United States District Judge for the
Southern District of California, sitting by designation.

## COUNSEL

Patrick Cantor, Buttar & Cantor LLP, Tukwila, Washington, for petitioner Anup Shrestha.

Tony West, Assistant Attorney General, Civil Division, Anthony C. Payne, Senior Litigation Counsel, Office of Immigration Litigation, and Corlette J. Winston, Attorney, Office of Immigration Litigation, for respondent Eric H. Holder, Jr.

## OPINION

GOULD, Circuit Judge:

Petitioner Anup Shrestha petitions for review of the Board of Immigration Appeals' ("BIA") order dismissing his appeal of an immigration judge's ("IJ") denial of his application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). We dismiss the petition for review as to Shrestha's asylum claim for lack of jurisdiction.[1] As to Shrestha's remaining claims,

---

[1]Shrestha conceded on appeal that his asylum claim was time barred.

we have jurisdiction under 8 U.S.C. § 1252, and we deny the petition for review.

## I

Shrestha is a native and citizen of Nepal who was admitted to the United States as a nonimmigrant student on a temporary basis in November 1998. Shrestha attended community college until December 2001, after which he stopped going to school. An immigration enforcement agent served Shrestha in April 2007 with a notice to appear and at a hearing, Shrestha, through counsel, conceded removability.

In July 2007, Shrestha applied for asylum, withholding of removal, and protection under the CAT. Shrestha explained in his asylum application that, at his family home in Nepal, he "was beaten by the Maoist[s] with a rod and bamboos" after "[t]hey came to [his] house to recruit [him]," and that he is "afraid that the Maoist[s] may again attack [him] and force [him] to join them."

Shrestha later filed a declaration in support of his application for asylum, withholding of removal, and CAT relief, describing his confrontation with the Maoists and subsequent events in more detail. Shrestha declared as follows: In October 1998, five individuals that identified themselves as Maoists came to his family's home in Nepal with rods and bamboo. The Maoists tried to recruit him to join their cause of insurgency against the Nepalese government. When Shrestha refused, an individual grabbed Shrestha by the arms. Shrestha panicked, tried to escape, but was caught and beaten. Shrestha lost consciousness and awoke in a hospital. When Shrestha was released from the hospital a week later, Shrestha's parents asked him to stay with his uncle, which Shrestha did until he came to the United States one month later in November 1998. After coming to the United States, Shrestha attended a community college. When Shrestha lost his job in 2001, he quit school because he could no longer afford

the tuition, and consequently he lost his student visa status. Shrestha's parents asked him not to come back to Nepal because the Maoist revolution was at its peak and "Maoists ha[d] been inquiring about [his] whereabouts frequently."

At a hearing before the IJ, Shrestha described the confrontation he had with the Maoists at his family home. Shrestha explained that he did not ask his parents for a statement in support of his application for relief because they are illiterate and, in any event, Shrestha concluded that his parents would not be able to help because they too feared the Maoists. Shrestha said that the Maoists had not confronted him except the single time, that none of his other family members had experienced problems with the Maoists, and that he was aware of only two instances when the Maoists had inquired about him since the confrontation, the most recent of which was in 2001.

In October 2007, the IJ denied all relief that Shrestha sought. The IJ concluded that Shrestha's asylum claim was time barred. The IJ denied Shrestha's claims for asylum and for withholding of removal on three alternative substantive grounds. First, the IJ found Shrestha not credible because, in response to questions concerning his problems with the Maoists, Shrestha was at times unresponsive, and his testimony was undetailed, inconsistent, and uncorroborated by a supportive statement from Shrestha's parents, with whom Shrestha had regular communication. Without credible testimony, Shrestha could not show that he was a refugee eligible for asylum and withholding of removal. Second, the IJ denied relief on the basis of materially changed country conditions in light of recent political developments in Nepal including a peace accord between the Maoists and the Nepalese government. Third, the IJ denied relief because Shrestha could be expected to relocate elsewhere in Nepal given that Shrestha had no problems with the Maoists during the time he was living with his uncle. As to Shrestha's CAT claim, the IJ concluded that Shrestha had not shown that there was a "clear

probability of the risk of torture" if Shrestha returned to Nepal.

In October 2008, the BIA affirmed the IJ's decision and dismissed Shrestha's appeal in a two-page order. The BIA agreed with the IJ that Shrestha's asylum application was time barred. The BIA found no clear error in the IJ's adverse credibility finding and concluded that a supportive statement from Shrestha's parents was reasonably expected. On the basis of the IJ's adverse credibility finding and Shrestha's failure to provide a corroborative affidavit from his parents, the BIA concluded that Shrestha had not met his burden of proof for asylum, and therefore Shrestha could not meet the higher burden of proof for withholding of removal. The BIA did not address the IJ's alternative conclusions that denial of asylum and withholding of removal relief was also warranted on the basis of changed country conditions and the possibility of relocation. The BIA agreed with the IJ that Shrestha was not entitled to CAT protection because Shrestha did not show that he would be subjected to torture on return to Nepal.

Shrestha timely petitioned for review. He has conceded on appeal that his asylum claim was time barred. Therefore, we lack jurisdiction to review Shrestha's petition as to his asylum claim and we dismiss that part of Shrestha's petition for review. *See Ramadan v. Gonzales*, 479 F.3d 646, 649-50 (9th Cir. 2007). We next address Shrestha's claims for withholding of removal and for CAT relief, over which we do have jurisdiction.

## II

When the BIA conducts its own review of the evidence and law rather than adopting the IJ's decision, our review "is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (quoting *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000)). But when, as here, the BIA's

"phrasing seems in part to suggest that it did conduct an independent review of the record," but the BIA's analysis on the relevant issues is confined to a "simple statement of a conclusion," we "also look to the IJ's oral decision as a guide to what lay behind the BIA's conclusion." *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1197 (9th Cir. 2000).

## III

We review for substantial evidence the BIA's determination that Shrestha is not eligible for withholding of removal. *Ahmed v. Keisler*, 504 F.3d 1183, 1191 (9th Cir. 2007). The BIA affirmed the IJ's denial of Shrestha's withholding of removal claim on the basis of the IJ's adverse credibility determination, and we review adverse credibility determinations under the substantial evidence standard. *Soto-Olarte v. Holder*, 555 F.3d 1089, 1091 (9th Cir. 2009).

**[1]** To qualify for withholding of removal, a petitioner must establish a "clear probability" that his "life or freedom would be threatened" if he returned to his homeland on account of "race, religion, nationality, membership in a particular social group, or political opinion." *Ahmed*, 504 F.3d at 1199 (citations omitted). Eligibility for withholding of removal can be established by demonstrating past persecution, *see id.*, or by "demonstrat[ing] . . . a subjective fear of persecution in the future . . . that . . . is objectively reasonable," *Wakkary v. Holder*, 558 F.3d 1049, 1060 (9th Cir. 2009).

## A

**[2]** For applications for asylum, withholding of removal, and CAT relief made on or after May 11, 2005, like Shrestha's, the REAL ID Act created the following new standards governing adverse credibility determinations:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility

determination on the demeanor, candor, or respon-
siveness of the applicant or witness, the inherent
plausibility of the applicant's or witness's account,
the consistency between the applicant's or witness's
written and oral statements . . . , the internal consis-
tency of each such statement, the consistency of such
statements with other evidence of record . . . , and
any inaccuracies or falsehoods in such statements,
without regard to whether an inconsistency, inaccu-
racy, or falsehood goes to the heart of the applicant's
claim, or any other relevant factor.

Pub. L. No. 109-13, Div. B, §§ 101(a)(3), 101(c), 101(d), 119
Stat. 231, 303 (2005) (codified at 8 U.S.C.
§§ 1158(b)(1)(B)(iii) (asylum); 1231(b)(3)(C) (adopting the
standard in 8 U.S.C. § 1158(b)(1)(B) for withholding of
removal); 1229a(c)(4)(C) (all other relief)).

The Ninth Circuit has only recently begun to apply the new
provisions to adverse credibility determinations. *See, e.g.*,
*Malkandi v. Mukasey*, 576 F.3d 906 (9th Cir. 2009). It is plain
from the REAL ID Act's terms that an adverse credibility
determination must be made after considering "the totality of
circumstances, and all relevant factors." It is also plain that
relevant factors will include demeanor, candor, responsive-
ness of the applicant or witness, the inherent plausibility of
the applicant or witness's account, consistency between the
applicant or witness's written and oral statements, internal
consistency of each statement, and consistency of statements
with other evidence. The above list is not exhaustive because
the trier of fact may also consider "any other relevant factor."

**[3]** While the above describes the statutory factors relevant
to deciding credibility based on total circumstances, the stat-
ute does not provide further guidance on the weight to be
given such factors. In light of the sparsity of Ninth Circuit
precedent construing the REAL ID Act in this context, we
conclude that it will be helpful to engage in a detailed analysis

of how the REAL ID Act guides our review of adverse credibility determinations.

**[4]** As stated above, the REAL ID Act requires that credibility determinations be made on the basis of the "totality of the circumstances, and all relevant factors." 8 U.S.C. § 1158(b)(1)(B)(iii). The Act lists specified factors that may be considered such as "demeanor," "candor," "responsiveness," "plausibility," "inconsistency," "inaccuracy," and "falsehood," but this list is not exhaustive. IJs may look beyond the listed factors to any "relevant factor" in assessing credibility under the "totality of the circumstances." *Id.* For example, even though lack of detail is not expressly listed as a factor that may be considered, the pre-REAL ID Act practice of looking to the level of detail of the claimant's testimony to assess credibility, *see Singh-Kaur v. INS*, 183 F.3d 1147, 1153 (9th Cir. 1999), remains viable under the REAL ID Act as it is a "relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii). The same logic holds as to other relevant factors not listed under the REAL ID Act but previously considered in assessing credibility.

**[5]** While the REAL ID Act's "totality of the circumstances" standard is permissive as to the breadth of factors that may form the basis of an adverse credibility determination, the totality of the circumstances approach also imposes the requirement that an IJ not cherry pick solely facts favoring an adverse credibility determination while ignoring facts that undermine that result. The Seventh Circuit, applying the REAL ID Act, cautioned that an "IJ cannot selectively examine evidence in determining credibility, but must present a reasoned analysis of the evidence as a whole." *Hanaj v. Gonzales*, 446 F.3d 694, 700 (7th Cir. 2006). The Third Circuit similarly cautioned as follows:

> Although we don't expect an Immigration Judge to search for ways to sustain an alien's testimony, neither do we expect the judge to search for ways to

undermine and belittle it. Nor do we expect a judge to selectively consider evidence, ignoring that evidence that corroborates an alien's claims and calls into question the conclusion the judge is attempting to reach.

*Shah v. Att'y Gen. of U.S.*, 446 F.3d 429, 437 (3d Cir. 2006) (internal quotation marks and citation omitted).

**[6]** Credibility determinations under the REAL ID Act must therefore "be 'reasonable' and 'take into consideration the individual circumstances' of the applicant." *Lin v. Mukasey*, 521 F.3d 22, 28 n.3 (1st Cir. 2008) (quoting H.R. Rep. No. 109-72, at 167 (2005), *reprinted in* 2005 U.S.C.C.A.N. 240, 292); *see also Hanaj*, 446 F.3d at 700 (stating that an IJ "must present a *reasoned analysis* of the evidence as a whole") (emphasis added). Thus the REAL ID Act imports a "rule of reason" into the assessment of the standard governing an IJ's credibility determination.[2]

---

[2]In so doing, the REAL ID Act is like many other statutes. We mention a few examples. In the antitrust context, interpreting § 1 of the Sherman Act, we stated as follows: "The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects. We review all the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and we determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2009) (footnote omitted); *see also Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918). Also, in the environmental law context, when evaluating compliance with NEPA, "[w]e apply a 'rule of reason' standard to review the adequacy of an agency's EIS, asking whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1032-33 (9th Cir. 2008) (citation omitted) (alteration in original). We have applied a rule of reason in review of agency action more generally as well. *See In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1124-25 (9th Cir. 2001) (stating that "whether an agency's delay in issuing a final order . . . warrant[s] mandamus" under 5 U.S.C. § 706(1) of the Administrative Proce-

**[7]** Doubtless the REAL ID Act requires a healthy measure of deference to agency credibility determinations. In *Jibril v. Gonzales*, 423 F.3d 1129, 1138 n.1 (9th Cir. 2005), we stated that the REAL ID Act is "a welcome corrective" and "in the future only the most extraordinary circumstances will justify overturning an adverse credibility determination." In *Kaur v. Gonzales*, 418 F.3d 1061, 1064 n.1 (9th Cir. 2005), we stated that after passage of the REAL ID Act, "our review of an IJ's adverse credibility finding is significantly restricted."

**[8]** The deference that the REAL ID Act requires makes sense because IJs are in the best position to assess demeanor and other credibility cues that we cannot readily access on review. *See* H.R. Rep. No. 109-72, at 167 ("[A]n immigration judge alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence. He [or she] is, by virtue of his [or her] acquired skill, uniquely qualified to decide whether an alien's testimony has about it the ring of truth." (quoting *Sarvia-Quintanilla v. INS*, 767 F.2d 1387, 1395 (9th Cir. 1985))). We have highlighted the pragmatic reasons for deference to agency credibility determinations in the context of the similarly situated administrative law judge as follows:

> Weight is given [to] the administrative law judge's determinations of credibility for the obvious reason that he or she sees the witnesses and hears them testify, while the Board and the reviewing

---

dure Act ("APA") requires applying, among other things, "a rule of reason" to "the time agencies take to make decisions"); *see also FCC v. Fox Television Stations, Inc.*, 129 S.Ct. 1800, 1830 (2009) (stating that under the APA, courts have recognized that "agency discretion is not unbounded," and "[i]n so holding, . . . courts have followed a venerable legal tradition, stretching back at least to the days of Sir Edward Coke" that "discretion" be "limited and bound with the rule of reason and law" (internal citations and quotation marks omitted)).

court look only at cold records. All aspects of the witness's demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication—may convince the observing trial judge that the witness is testifying truthfully or falsely. These same very important factors, however, are entirely unavailable to a reader of the transcript, such as the Board or the Court of Appeals.

*Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 662 (9th Cir. 2003) (alteration in original) (internal quotation marks and citations omitted).

**[9]** Despite our recognition that agency credibility determinations deserve substantial deference, the REAL ID Act does not give a blank check to the IJ enabling him or her to insulate an adverse credibility determination from our review of the reasonableness of that determination. For example, an IJ normally may not rely on nothing more than a vague reference to the "totality of the circumstances" or recitation of naked conclusions that a petitioner's testimony was inconsistent or implausible, that the petitioner was unresponsive, or that the petitioner's demeanor undermined the petitioner's credibility. We have consistently required that the IJ state explicitly the factors supporting his or her adverse credibility determination. *See Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002) ("Although the substantial evidence standard is deferential, the IJ must provide a specific cogent reason for the adverse credibility finding." (citation and internal quotation marks omitted)). This rule is not altered by the REAL ID Act and is warranted: "Boilerplate opinions, which set out general legal standards yet are devoid of statements that evidence an individualized review of the petitioner's contentions and circumstances, neither afford the petitioner the . . . review to which he or she is entitled, nor do they provide an adequate basis for

this court to conduct its review." *Castillo v. INS*, 951 F.2d 1117, 1121 (9th Cir. 1991).

**[10]** As a corollary principle, we have concluded that the better practice is for the agency to provide specific instances in the record that form the basis of the agency's adverse credibility determination. Thus, for example, "[t]o support an adverse credibility determination based on unresponsiveness, the BIA must identify particular instances in the record where the petitioner refused to answer questions asked of him." *Singh v. Ashcroft*, 301 F.3d 1109, 1114 (9th Cir. 2002) (citation omitted). Similarly, we will reverse adverse credibility determinations based on boilerplate demeanor findings, *see Paramasamy v. Ashcroft*, 295 F.3d 1047, 1048-50 (9th Cir. 2002), because the IJ's demeanor findings should specifically point out the noncredible aspects of the petitioner's demeanor, *Arulampalam v. Ashcroft*, 353 F.3d 679, 685-87 (9th Cir. 2003).

The REAL ID Act did not strip us of our ability to rely on the institutional tools that we have developed, such as the requirement that an agency provide specific and cogent reasons supporting an adverse credibility determination, to aid our review.[3] In our first opinion applying the REAL ID Act to credibility determinations, we stated that the IJ must still "provide 'specific and cogent reasons' in support of an adverse credibility determination." *Malkandi*, 576 F.3d at 917 (quoting *He v. Ashcroft*, 328 F.3d 593, 595 (9th Cir. 2003)). At least one other circuit has reached the same conclusion.

---

[3]Rather, concerning credibility, the REAL ID Act's "principal purpose was to eliminate a limitation, elaborated by the Ninth Circuit, on the type of inconsistencies upon which an IJ could rely in assessing credibility." *Rivas-Mira v. Holder*, 556 F.3d 1, 5 (1st Cir. 2009). "The net effect of the neoteric provision was to scrap the 'heart of the matter' rule." *Id.*; *see also Lin*, 521 F.3d at 28 n.3. Thus, the REAL ID Act now permits an IJ to base an adverse credibility determination on any inconsistency "without regard to whether an inconsistency . . . goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii).

*See Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1231 (11th Cir. 2006) (per curiam) (applying the REAL ID Act and stating that "the IJ must offer specific, cogent reasons for the [adverse credibility] finding"). Requiring specificity on the part of the IJ is also consistent with the legislative history expressing the intent of Congress that IJs will describe the factors forming the basis of their credibility findings. H.R. Rep. No. 109-72, at 167 ("Congress expects that the trier of fact will describe those factors that form the basis of the trier's opinion. This is true even where the trier of fact bases a credibility determination in part or in whole on the demeanor of the applicant.").

**[11]** The REAL ID Act implemented an important substantive change concerning the kinds of inconsistencies that may give rise to an adverse credibility determination. Inconsistencies no longer need to "go to the heart" of the petitioner's claim to form the basis of an adverse credibility determination. 8 U.S.C. § 1158(b)(1)(B)(iii). As a threshold matter, an IJ may *consider* any inconsistency. As one commentator has suggested, "That immigration judges have the power to consider any inconsistency, however, is quite distinct from the issue of whether the inconsistencies cited support an adverse credibility determination." Scott Rempell, *Credibility Assessments and the REAL ID Act's Amendments to Immigration Law*, 44 Tex. Int'l L.J. 185, 206 (2008). There is a measure of truth in that observation.

**[12]** To support an adverse credibility determination, inconsistencies must be considered in light of the "totality of the circumstances, and all relevant factors." 8 U.S.C. § 1158(b)(1)(B)(iii); *see Kadia v. Gonzales*, 501 F.3d 817, 822 (7th Cir. 2007) ("[Under the REAL ID Act, t]he immigration judge may consider inaccuracies or falsehoods that do not go to the heart of the asylum applicant's claim, but he can do so only as part of his consideration of 'the totality of the circumstances, and all relevant factors.' "). The REAL ID Act's

charge that inconsistencies be considered in the context of the total circumstances carries with it important implications.

[13] First, an utterly trivial inconsistency, such as a typographical error, will not by itself form a sufficient basis for an adverse credibility determination. *See Hassan v. Holder*, 571 F.3d 631, 637 (7th Cir. 2009) ("Although the REAL ID Act requires a highly deferential review of credibility findings, Immigration Judges may not rely on inconsistencies that are completely trivial . . . ." (citation omitted)); *Kadia*, 501 F.3d at 822 (stating in dicta that the IJ "cannot discredit otherwise persuasive testimony because of a misspelling in the asylum application").[4] Mindful of the legitimate impact that even minor inconsistencies may have on credibility, we conclude only that trivial inconsistencies that under the total circumstances have no bearing on a petitioner's veracity should not form the basis of an adverse credibility determination.

---

[4]We do not intend to suggest that under the totality of the circumstances each inconsistency must be material in the sense of important to the petitioner's well-founded fear of persecution; such a requirement would contradict the REAL ID Act's plain text. *See Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 165 (2d Cir. 2008). Indeed, under the REAL ID Act, even minor inconsistencies, in proper circumstances, will support an adverse credibility determination. By persuasive analogy, in the context of administrative proceedings before the Federal Communications Commission, the Supreme Court explained how minor inconsistencies may prove probative of an individual's veracity:

> The fact of concealment may be more significant than the facts concealed. The willingness to deceive a regulatory body may be disclosed by immaterial and useless deceptions as well as by material and persuasive ones. We do not think it is an answer to say that the deception was unnecessary and served no purpose.

*FCC v. WOKO, Inc.*, 329 U.S. 223, 227 (1946). Similarly, even a petitioner's minor inconsistencies, when aggregated or when viewed in light of the total circumstances, may undermine credibility. *Cf. United States v. Arvizu*, 534 U.S. 266, 274-75 (2002) (concluding that in the "totality of the circumstances" analysis required for a reasonable-suspicion determination in the *Terry* context, inferences may be drawn from the cumulative impact of activities that appear innocent when viewed individually).

**[14]** Second, in evaluating inconsistencies, the relevant circumstances that an IJ should consider include the petitioner's explanation for a perceived inconsistency, *see Soto-Olarte*, 555 F.3d at 1091, and other record evidence that sheds light on whether there is in fact an inconsistency at all. To ignore a petitioner's explanation for a perceived inconsistency and relevant record evidence would be to make a credibility determination on less than the total circumstances in contravention of the REAL ID Act's text.

In summary, we conclude that under the REAL ID Act, IJs must "provide specific and cogent reasons in support of an adverse credibility determination." *Malkandi*, 576 F.3d at 917 (internal quotation marks omitted). In assessing the "totality of the circumstances," an IJ should discuss which statutory factors, including but not limited to "demeanor," "candor," "responsiveness," "plausibility," "inconsistency," "inaccuracy," and "falsehood," form the basis of the adverse credibility determination. 8 U.S.C. § 1158(b)(1)(B)(iii). An IJ may also rely on any other relevant factor. For each factor forming the basis of an adverse credibility determination, the IJ should refer to specific instances in the record that support a conclusion that the factor undermines credibility. *See, e.g.*, *Singh*, 301 F.3d at 1114 (unresponsiveness); *Arulampalam*, 353 F.3d at 685-87 (demeanor). When an inconsistency is cited as a factor supporting an adverse credibility determination, that inconsistency should not be a mere trivial error such as a misspelling, *Hassan*, 571 F.3d at 637, and the petitioner's explanation for the inconsistency, if any, should be considered in weighing credibility, *Soto-Olarte*, 555 F.3d at 1091. Because an adverse credibility determination under the REAL ID Act must be based on the "totality of the circumstances," the IJ also should consider and address, as necessary or otherwise appropriate, relevant evidence that tends to contravene a conclusion that a given factor undermines credibility. *Hanaj*, 446 F.3d at 700. On review of agency credibility determinations, the broad permissible standards that may warrant an adverse credibility determination must be assessed under a rule of rea-

son. *See Lin*, 521 F.3d at 28 n.3; *Hanaj*, 446 F.3d at 700. This rule-of-reason analysis should give ample deference to the responsible agency, which has specialized expertise and the opportunity to observe the testimony. But the analysis on review must also take into account the totality of circumstances, and should recognize that the normal limits of human understanding and memory may make some inconsistencies or lack of recall present in any witness's case.

**B**

Having discussed how the REAL ID Act guides our credibility inquiry, we turn to application of the standard to the facts of this case.

### 1.   Unresponsiveness

The IJ concluded that Shrestha "had no response" to questions concerning the Maoists' continued interest in him. The BIA similarly concluded that Shrestha was "at times, non-responsive."

**[15]** The REAL ID Act expressly permits the agency to base a credibility determination on the "responsiveness of the applicant or witness." 8 U.S.C. § 1158(b)(1)(B)(iii). As discussed above, the REAL ID Act did not alter the requirement that the IJ must identify specific instances, supported by the record, where the petitioner did not respond. *Singh*, 301 F.3d at 1114. Shrestha argues that neither the BIA nor the IJ identified particular instances in the record where Shrestha was unresponsive. We disagree. The agency is not required to provide a pinpoint citation to the record, but rather to "identify particular *instances* in the record" where the petitioner was unresponsive. *Id.* (emphasis added). The IJ did just that. The IJ did not simply state that Shrestha was unresponsive, but that Shrestha was unresponsive to questions concerning "whether anyone may have been looking for him since he was last in Nepal in November of 1998." The IJ, after noting a

"long pause" in Shrestha's previous answer, asked whether Shrestha "ha[d] any idea when anybody was supposedly looking for you?" The IJ, unable to elicit a comprehensible answer, asked again: "If you have an idea when anybody was looking for you, tell me when . . . . You've given ambiguous responses here. I don't understand what you're saying." The IJ stated, "The record will reflect that there's a long pause. The Respondent's not saying anything." Shrestha never responded to these queries, and finally the IJ abandoned that line of questioning. The IJ's specificity in pointing to this instance of unresponsiveness went well beyond the type of "general statement that the petitioner was unresponsive" that *Singh* was concerned with. *Id.* (internal quotation marks omitted). This instance of blatant and unexplained unresponsiveness supports the IJ's adverse credibility determination. But there is more.

The record also reflects that Shrestha was unresponsive in other instances, though these instances were not specifically identified by the IJ or BIA in their decisions. When asked why he did not list his uncle's address as his most recent address before coming to the United States, Shrestha started to answer, "But I was just . . . ." The IJ, apparently not satisfied that an answer was forthcoming, asked, "Is there an answer?" Later, when Shrestha's counsel asked him whether there was "anything else which [they] did not cover" or that Shrestha "want[ed] to . . . tell the Judge," Shrestha gave no reply, and the IJ stated, "The record will reflect silence." When the IJ asked why Shrestha did not "follow the instructions by [providing specific dates, places and descriptions] in the application [for relief]," Shrestha again gave no reply, and the IJ added, "Let the record reflect that there is no response." While neither the IJ nor the BIA specifically referred to these instances of unresponsiveness in rendering their decisions, the record's demonstration that Shrestha's unresponsiveness was a pattern throughout the hearing is one of the circumstances that the REAL ID Act entitles the agency to consider in assessing Shrestha's credibility.

## 2.  Lack of detail

The BIA concluded that Shrestha's "undetailed . . . testimony," among other reasons, supported the IJ's adverse credibility finding. The IJ noted that Shrestha had provided "no particular details" concerning the Maoists' continued interest in him.

**[16]** Shrestha supplied only vague assertions that Maoists had been inquiring about him and gave few details. The most detailed testimony Shrestha provided at the hearing was that "[t]he first [time the Maoists inquired about me] was like a week after I came back [to the United States] again [in 1998]," and "[t]he second time [the Maoists inquired about me] . . . was once when I went out of status, like in December of 2001, when I quit school." But Shrestha did not identify the names of any of the Maoists or describe them in any way. Nor did he state how many were inquiring about him, why they were looking for him, what they wanted, why he thought their interest in him persisted given that they had not inquired about him since 2001, or why he continued to fear the Maoists in light of their apparent loss of interest in him. The IJ gave Shrestha an opportunity to supplement his responses to provide more detail concerning any "fear [he has] of anything bad happening to [him] or has happened to [him]," but Shrestha declined to do so.

## 3.  Inconsistencies

Both the BIA and IJ noted that Shrestha had provided inconsistent testimony and equivocated. The IJ concluded that Shrestha claimed alternatively, and inconsistently, to have lived most recently before coming to the United States with both his parents and his uncle. The IJ also concluded that Shrestha's hearing testimony that Maoists had inquired about him on two occasions in 1998 and 2001 was inconsistent with his declaration testimony that "Maoists have been inquiring about [his] whereabouts frequently."

Shrestha cites *Chebchoub v. INS*, 257 F.3d 1039, 1043 (9th Cir. 2001), for the proposition that any inconsistencies that form the basis of an adverse credibility determination must go to the heart of the petitioner's claim and *Vilorio-Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir. 1988), for the proposition that minor inconsistencies that reveal nothing about a petitioner's fear for his or her safety are insufficient. Shrestha is mistaken to rely on these cases as they are both pre-REAL ID Act cases. "[U]nder the REAL ID Act credibility findings no longer need to go 'to the heart of the applicant's claim.' " *Malkandi*, 576 F.3d at 918 (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). The explicit statutory language and purpose behind the statutory change totally demolish Shrestha's argument that inconsistencies must go to the heart of his claim.

When the IJ asked Shrestha about his inconsistent response regarding with whom he had stayed before coming to the United States, Shrestha explained that his stay with his uncle was only temporary and for one month. For this reason, he said that he gave his parents' address, not his uncle's, in his application for relief. The IJ and BIA did not consider Shrestha's explanation. Even if there is some slight inconsistency between Shrestha providing his parents' address as his most recent address and stating that he had stayed with his uncle temporarily, it is too trivial, under the total circumstances, alone to form the basis of the adverse credibility determination.

[17] On the other hand, the IJ's inconsistency determination regarding Shrestha's accounts of the frequency with which the Maoists had inquired about him is supported by substantial evidence. This inconsistency is not merely trivial. Although inconsistencies no longer need to go to the heart of the petitioner's claim, when an inconsistency is at the heart of the claim it doubtless is of great weight. Shrestha's asserted fear of the Maoists formed the crux of his application for relief. Despite having the opportunity to do so, Shrestha pro-

vided no explanation for the inconsistency in his testimony about the Maoists' inquiries as to his whereabouts. In light of the total circumstances, Shrestha's inability to consistently describe the underlying events that gave rise to his fear was an important factor that could be relied upon by the IJ in making an adverse credibility determination.

### 4.   Corroboration

[18] Under the REAL ID Act, we may not reverse the IJ's and BIA's conclusion that Shrestha should have been able to obtain a supportive affidavit from his parents to corroborate his claims concerning the Maoists unless "a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4). The REAL ID Act expressly permits the agency to require an applicant to "provide evidence that corroborates otherwise credible testimony . . . , unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii). This differs from our pre-REAL ID Act rule that the agency may not require corroborating evidence in the absence of an explicit adverse credibility determination. *See Aden v. Holder*, ___ F.3d ___, No. 08-71168, 2009 WL 4877951, at * 2-3, (9th Cir. Dec. 18, 2009) (concluding that "Congress abrogated" prior precedent "that corroboration cannot be required from an applicant who testified credibly").

Shrestha cites *Sidhu v. INS*, 220 F.3d 1085 (9th Cir. 2000), for the proposition that "it is inappropriate to base an adverse credibility determination on an applicant's inability to obtain corroborating affidavits from relatives or acquaintances living outside of the United States" because "such corroboration is almost never easily available." *Id.* at 1091-92. We reject Shrestha's reliance on *Sidhu*. First, *Sidhu* states a general rule that admits exceptions. *Id.* (stating that affidavits from those outside the United States are "*almost never* easily available" (emphasis added)); *see also Kaur v. Ashcroft*, 379 F.3d 876, 890 (9th Cir. 2004) ("It is *generally inappropriate . . .* 'to base

an adverse credibility determination on an applicant's inability to obtain corroborating affidavits from relatives or acquaintances living outside of the United States—such corroboration is almost never easily available.' " (emphasis added) (quoting *Sidhu*, 220 F.3d at 1091-92)).[5] Second, and more importantly, *Sidhu* applied the pre-REAL ID Act standard. The REAL ID Act changed the standard governing when a trier of fact may require corroborating evidence from where the evidence is "easily available" to where the evidence is "reasonably obtainable," *see* 8 U.S.C. § 1158(b)(1)(B)(ii), and imposed a heightened standard of review requiring that we reverse an agency's determination concerning the availability of corroborative evidence only if a reasonable trier of fact would be compelled to conclude that such corroborating evidence is unavailable, 8 U.S.C. § 1252(b)(4). It was within Congress's power to make such changes in the standards governing corroborating evidence.

**[19]** Here, the BIA concluded that corroborating evidence was reasonably obtainable (the BIA used the phrase "reasonably expected"), and a reasonable trier of fact would not be compelled to conclude that corroborating evidence was unavailable. *See* 8 U.S.C. § 1252(b)(4). Shrestha's parents were not unreachable. They were not, for example, living in a remote village accessible only by dirt roads. To the contrary, Shrestha's parents were living in the capital city of Kathmandu and Shrestha was in regular contact with them. While Shrestha may have explained some difficulties in obtaining an affidavit, including his parents' illiteracy and their fear of the Maoists, that is not sufficient for us to conclude that a reason-

---

[5]Nor is the flexibility of *Sidhu*'s rule a mere theoretical possibility: we concluded in *Chebchoub* that obtaining an affidavit from a "close relative" living overseas—there, Western Europe—would be "a relatively uncomplicated task" and would "not pose the type of particularized evidentiary burden that would excuse corroboration." 257 F.3d at 1044-45 (citation omitted) (concluding that such corroborating evidence would be easily available and upholding the BIA's conclusion that Chebcoub was not credible because he did not produce it).

able trier of fact would be *compelled* to conclude that evidence corroborating the situation with the Maoists in Nepal was unavailable, as is now required by the REAL ID Act.

[20] In sum, the BIA's conclusion that the IJ properly denied Shrestha withholding of removal is supported by substantial evidence. The adverse credibility determination by the IJ relied on factors explicitly permitted by the REAL ID Act including unresponsive and undetailed testimony, and inconsistent testimony for which there was no explanation or corroboration. In the totality of circumstances it was a reasonable adverse credibility determination, grounded in the record and based on real problems with Shrestha's testimony, not mere trivialities. Absent Shrestha's discredited testimony, there is no objective evidence that establishes a "clear probability" that upon return to Nepal Shrestha will be subject to persecution based on a protected ground. *See Ahmed*, 504 F.3d at 1199 (citation omitted).[6]

## IV

We review for substantial evidence the BIA's determination that Shrestha is not eligible for protection under CAT. *See Silaya v. Mukasey*, 524 F.3d 1066, 1070 (9th Cir. 2008) (citation omitted). We review the BIA's interpretation of purely legal questions de novo. *See Zheng v. Ashcroft,* 332 F.3d 1186, 1193 (9th Cir. 2003).

The IJ denied Shrestha's CAT claim because Shrestha "ha[d] not shown any 'clear probability' of the risk of 'torture' if he had to return to Nepal." The BIA similarly concluded that Shrestha "failed to demonstrate that he would be

---

[6]Because concluding that the adverse credibility determination is based on substantial evidence is sufficient to deny Shrestha's petition as to withholding of removal, we do not reach the IJ's alternative conclusions (which the BIA did not address) that relief is not warranted due to changed country conditions and the possibility that Shrestha could relocate.

subjected to torture by or with the acquiescence of any government official if returned to Nepal."

To receive CAT protection, a petitioner must prove that it is "more likely than not" that he or she would be tortured if removed. 8 C.F.R. § 1208.16(c)(2); *Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir. 2001). An adverse credibility determination is not necessarily a death knell to CAT protection. *See Kamalthas*, 251 F.3d at 1284 ("[W]e are not comfortable with allowing a negative credibility determination in the asylum context to wash over the torture claim . . . ." (quoting *Mansour v. INS*, 230 F.3d 902, 909 (7th Cir. 2000))). But when the petitioner's "testimony [is] found not credible, to reverse the BIA's decision [denying CAT protection,] we would have to find that the reports alone compelled the conclusion that [the petitioner] is more likely than not to be tortured." *Almaghzar v. Gonzales*, 457 F.3d 915, 922-23 (9th Cir. 2006).

**[21]** When Shrestha's CAT claim is denuded of his discredited testimony, all that remains is the background material he provided concerning conditions in Nepal. The background materials establish the presence of violent Maoists in Nepal. For example, in early 2006, "Maoist forces abducted civilians and committed unlawful killings and torture." But the materials also establish, and Shrestha acknowledged, that as of May 2006 there was a peace accord in place between the Maoists and the Nepalese Government. Furthermore, the materials include a conclusion by the Asylum and Immigration Tribunal that "it would only be in very limited cases that a person would be able to show he or she faces a risk in his or her home area at the hands of the Maoists." Shrestha has not demonstrated that his experience falls within one of those limited cases and the information contained in the background materials does not compel the conclusion that Shrestha is more likely than not to be tortured if he returns to Nepal. Therefore, the BIA's determination that Shrestha is not entitled to CAT protection is supported by substantial evidence.

## V

**[22]** We **DISMISS** Shrestha's petition for review as to his asylum claim, and we **DENY** Shrestha's petition for review of the agency's rejection of his withholding of removal and CAT claims.