**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANTONIO PEREZ-ARCEO, *Petitioner*, v. LORETTA E. LYNCH, Attorney General, *Respondent.* | No. 12-70635 Agency No. A091-704-485 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 18, 2016
San Francisco, California

Filed May 12, 2016

Before: John T. Noonan, Ronald M. Gould,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### Immigration

The panel granted Antonio Perez-Arceo's petition for review of the Board of Immigration Appeals' decision finding him removable for participating in an attempt to smuggle his wife's mother and sister-in-law into the United States.

The panel held that the BIA erred in failing to address the Immigration Judge's seemingly inconsistent credibility findings. The panel also held that the IJ erred in failing to make an explicit finding that Perez-Arceo engaged in "an affirmative act of help, assistance, or encouragement" of smuggling, as this court's case law requires. The panel remanded on an open record for the IJ to reconsider his ruling, provide further explanation, and engage in further factfinding if necessary.

### COUNSEL

Jorge I. Rodriguez-Choi, Oakland, California, for Petitioner.

Ada E. Bosque, Yamileth Davila, and Ashley Martin (argued), Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

GOULD, Circuit Judge:

Antonio Perez-Arceo petitions for review of a decision of the Board of Immigration Appeals (BIA) finding him removable under 8 U.S.C. § 1182(a)(6)(E)(i). That statute provides that "[a]ny alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible." Antonio was charged as removable along with his son Juan and his wife Micaela for allegedly participating in an attempt to smuggle Micaela's undocumented sister-in-law and mother into the United States in a van. The Immigration Judge (IJ) held a joint hearing in which all three testified that Micaela was solely responsible for the smuggling attempt. But while the IJ found Micaela credible, the IJ also found Juan and Antonio's testimony not credible, and the IJ held that all three were removable.

We grant Antonio's petition for review. The BIA did not address the IJ's seemingly inconsistent credibility findings. Nor did the IJ make a finding that Antonio engaged in "an affirmative act of help, assistance, or encouragement" of smuggling as our case law requires for a violation of § 1182(a)(6)(E)(i). *Altamirano v. Gonzales*, 427 F.3d 586, 592 (9th Cir. 2005). We remand on an open record for the IJ to reconsider his ruling, provide further explanation, and engage in further factfinding if necessary.

## I

Antonio Perez-Arceo is a Mexican citizen who became a legal permanent resident of the United States in 1986. His

wife Micaela Perez de Pacheco and his son Juan Perez-Pacheco were also legal permanent residents. In early June 2004, the family drove from the United States to Mexico to take Antonio's ill daughter to the doctor. On June 6, 2004, the family attempted to return to the United States in a van through the port of entry in Otay Mesa, California. Juan was driving the van and Antonio was in the front passenger seat. Micaela sat in the far back row with her mother Maria Garcia and her sister-in-law Maria Rodriguez. Antonio and Micaela's other children were in the middle row. The family's ride to the border from the home where they had been staying in Mexico lasted 20–30 minutes.

When the family reached the port of entry, Border Patrol suspected that Garcia and Rodriguez "were not the rightful owners of the documents they presented," and the van was held for inspection. Antonio, Juan, and Micaela were each interviewed separately by a Border Patrol officer. Antonio told Border Patrol that he knew Garcia and Rodriguez did not have the proper documents to enter the United States, but he "did not realize they were in the vehicle till he woke up while being in line to cross the border." When he realized the undocumented women were in the van, he "got into an argument with his wife and son," but he did not leave the van "because it was to [sic] late and he was near the officers [sic] booth."

Micaela told Border Patrol a similar story. Micaela explained that "she made arrangements with her brother" to smuggle Garcia and Rodriguez into the United States and

"her husband [Antonio] had no idea."[1]  She further stated that she "paid a lady" $150 to get documents for her mother and sister-and-law to cross the border.  She stated that she "regret[ted] doing it" and would "never do it again."

When Juan was questioned at the border, he told a different story.  He said that Antonio made the arrangements to bring Rodriguez and Garcia into the United States.  And he said that Juan's uncle was going to pay Antonio $1500 for the service.  Juan stated that Antonio gave Rodriguez and Garcia false immigration documents to use at the border.

Juan, Antonio, and Micaela were each charged with removability for smuggling under 8 U.S.C. § 1182(a)(6)(E)(i), and the proceedings were consolidated. On March 19, 2007, Juan submitted an affidavit under oath stating,

> I retract the statements made to the Immigration Officer on or about June 6, 2004 at the border inspection point in Otay Mesa. I was driving the van, but when I was interviewed by the immigration officer, I was scared. I saw my mother holding the children, and was afraid what would happen to my two younger sisters and younger brother, if the

---

[1] Micaela's I-213 form summarizing this interview was admitted into evidence at the joint hearing with Antonio, Micaela, and Juan, but it was not included in Antonio's Certified Administrative Record on appeal. We located this document in the Certified Administrative Record for Juan and Micaela's petitions for review, Ninth Circuit No. 12-73202, which were dismissed in 2013.  Although the I-213 form was not in the CAR for Antonio's appeal, the IJ had it before him when making a decision on all three cases at the same hearing.

> Immigration [Officer] detained my mother.
> Out of panic and fear I said that it was my
> father who made the arrangements. I did not
> want my younger sisters to be without a
> mother.
>
> I did not participate in the making of any
> plans to smuggle Mrs. Garcia and Mrs.
> Rodriguez to the United States. The one who
> made all the arrangements was my mother and
> her brother. My mother agreed with her
> brother that her brother would pay my mother
> $1,500. . . . I was aware that Mrs. Garcia and
> Mrs. Rodriguez were in the car. However, it
> was my mother who asked them to get in the
> van.

Juan reiterated, "I am certain that my father was not involved in making the arrangements."[2]

The IJ held a joint hearing for Antonio, Micaela, and Juan on October 22, 2009. One attorney represented all three respondents. The government initially noted that Micaela had conceded removability. Juan then testified and explained that his mother had arranged for smuggling Garcia and Rodriguez. He testified that his March 2007 statement implicating his mother was accurate; he claimed to have lied during his June 2006 interview when placing the blame on Antonio because the Border Patrol had threatened to take the children away from Micaela if he did not implicate someone.

---

[2] Juan's I-213 form and retraction letter were also erroneously omitted from Antonio's Certified Administrative Record. *See* note 1, *supra.*

Antonio then testified consistent with his I-213 post-detention statements, explaining that the smuggling was his wife's idea and that he had no knowledge of it until they were near the border. Antonio testified that he had been drinking the night before and first learned that the women were in the backseat right before reaching the border when they "were passing the documents" to present to Border Patrol and he said "oh my God, why so many?" That, according to Antonio's testimony, is when he "turned around and saw" Garcia and Rodriguez in the far back row of the van; he had not heard them speak during the trip. Antonio surmised that his wife had not told him about the women in the backseat because she had pitched a smuggling plan to him two months earlier and he "did not agree."

The government then rested, and the respondents called Micaela to the stand. Micaela testified consistent with her I-213 that the smuggling had been entirely her idea and Antonio had no knowledge of it until they neared the border. She explained that she had hidden it from him because he had previously said no when she brought up the idea. Micaela explained that she had kept the women hidden from Antonio by seating them in the back row of the van behind the "high" seats in the middle row. Micaela also echoed Juan's testimony that Border Patrol told her they would take her kids away if she didn't tell the truth.

The government then called Border Patrol Officer Jesus Lopez, Jr., who had interviewed all three respondents at the border. Lopez testified via telephone that he did not remember this particular case but there was "no possible way" he had threatened to take anyone's kids away and he would "never" ask questions or make statements before turning on the video recording.

The IJ ruled from the bench on October 29, 2009. The IJ first held that the burden was on the government to prove removability by clear and convincing evidence. The IJ recognized that to prove removability for smuggling, the government must show an "affirmative act" to attempt or aid in smuggling beyond mere knowledge. *See Altamirano v. Gonzales*, 427 F.3d 586, 592 (9th Cir. 2005). The IJ concluded that Micaela was removable because of her testimony that she "obtained the documents and was going to be paid $1,500 by her brother" to smuggle her sister-in-law and mother into the United States. The IJ also relied on Micaela's admission of guilt in her I-213 form. The IJ then turned to Juan and found that his "affirmative act" was driving the van and handing Rodriguez and Garcia's documents to the immigration officials, as well as making a false statement to Border Patrol regarding Rodriguez and Garcia's intended length of stay.

Finally, the IJ addressed the issue of Antonio's removability and stated that he did not believe Juan's changed story that absolved Antonio of guilt, nor did he believe Antonio's testimony. The IJ pointed to five apparent inconsistencies to support his negative credibility determinations about Juan and Antonio's testimony. First, the IJ reasoned that Antonio said that he was going to Mexico to take his son to the doctor, but Juan and Micaela said they went for a daughter. Second, the IJ said that Juan testified that he and Antonio talked in the van on the way to the border, but Antonio testified that they did not. Third, Micaela and Juan both testified that they were threatened with the kids' removal if they did not blame someone, but the IJ credited the Border Patrol Officer's testimony that he would "never say that in any case." Fourth, the IJ noted that Juan claimed to have "made . . . up" the $1500 smuggling fee in

his statement at the border, but Micaela also stated this same amount in her interview at the border.  Finally, the IJ relied on an apparent discrepancy that Antonio told Border Patrol that he was asleep in the van when Garcia and Rodriguez entered, while Antonio testified that he was the last to enter the van.  The IJ also noted that Antonio had a prior charge of removability for alien smuggling for which he had received cancellation of removal under 8 U.S.C. § 1229b(a).  In sum, the IJ believed that it was "not plausible that the mother would risk her son and husband in this way without their knowledge," nor was it "plausible that the father who already had [a] waiver [from past smuggling charges] would risk his son and his wife this way without their knowing."

The BIA dismissed the appeal, ruling that the IJ's decision to credit Juan's "more contemporaneous statements" at the border, rather than Juan's retraction and Antonio's testimony, was "not clearly erroneous."

## II

When the government charges a lawfully-admitted alien with removability for smuggling, it "must prove by clear and convincing evidence that [the respondent] took actions . . . that amount to 'knowingly encouraging, inducing, assisting, abetting, or aiding' their unlawful entry into the United States." *Santiago-Rodriguez v. Holder*, 657 F.3d 820, 830 (9th Cir. 2011) (alterations omitted) (quoting 8 U.S.C. § 1227(a)(1)(E)(i)).  "'[M]ere presence and knowledge' that an accompanying alien is attempting to enter the country illegally" is insufficient.  *Id.* at 833 (quoting *Altamirano*, 427 F.3d at 592).  The charge of alien smuggling "requires an affirmative act of help, assistance, or encouragement."  *Id.*

Here, the only record evidence of an "affirmative act" by Antonio was Juan's initial statement to Border Patrol that Antonio made the arrangements to get documents for Rodriguez and Garcia, and that Antonio was going to receive money for the service. But in a supplemental letter and his in-court testimony, Juan disavowed that statement. To find Antonio removable, the immigration judge had to find Juan's second story implicating his mother to be not credible. The immigration judge also had to find not credible Antonio and Micaela's testimony that Micaela was responsible for arranging the smuggling and procuring the false documents.

We review an immigration judge's credibility determination for substantial evidence. *Shrestha v. Holder*, 590 F.3d 1034, 1039 (9th Cir. 2010).[3] Immigration judges must consider the "totality of the circumstances, and all relevant factors," including inconsistencies and falsehoods. *Id*. at 1040. Inconsistencies need not "'go to the heart' of the petitioner's claim to form the basis of an adverse credibility

---

[3] It is not clear whether the provisions of the REAL ID Act that govern credibility determinations in removal proceedings, 8 U.S.C. 1229a(c)(4)(C), apply to this case because it is unclear whether Antonio's motion to terminate proceedings is an "[a]pplication[] for relief from removal" within the meaning of the statute. *Compare, e.g.*, *Matter of Manuela Norma Mendiola-Salgado*, 2009 WL 773177, *1 (B.I.A. Feb. 27, 2009) (unpublished) (suggesting that it is) *with, e.g.*, *Matter of George Araujo-Malagon*, 2009 WL 4899061, *1 (B.I.A. Nov. 30, 2009) (unpublished) (suggesting that it is not) *and* 8 C.F.R. § 1240.8(d) (suggesting that applications for relief are claims on which the alien bears the burden of proving he should not be removed because he is entitled to a "benefit or privilege"). As our result in this case is the same whether or not the REAL ID Act provisions apply, we do not reach this question. We will assume the REAL ID Act applies here because even under its more deferential standards, the IJ's decision is not supported by substantial evidence.

determination." *Id.* at 1043. But "trivial inconsistences that under the total circumstances have no bearing on a petitioner's veracity should not form the basis of an adverse credibility determination." *Id.* at 1044.

## III

Antonio contends that the immigration judge erred in concluding that there were sufficient discrepancies to discredit Juan and Antonio's testimony that Antonio did not participate in the smuggling. The immigration judge relied on five inconsistences or omissions. Antonio challenges, while the government defends, each. We conclude that three of these five alleged problems identified by the IJ were insufficient or inaccurate and cannot support a negative credibility determination.

## A

First, the immigration judge relied on the inconsistency that Antonio said they went to Mexico to take his son to the doctor, but Juan and Micaela both said they went to take his daughter. The IJ was correct that Antonio's I-213 states that Antonio said he went to Tijuana "because he wanted to take his son to see a doctor." But like Juan and Micaela, Antonio also testified that he went to Tijuana to take his daughter to the doctor. The IJ simply ignored Antonio's testimony that his daughter was the sick child. And the government did not question any witness about the discrepancy between the I-213 and the testimony, so we have no explanation for why the I-213 says what it does. On the record here, the inconsistency with Antonio's I-213 cannot support a negative credibility finding because the IJ did not ask Antonio about the inconsistency. *See Soto-Olarte v. Holder*, 555 F.3d 1089,

1091–92 (9th Cir. 2009) (holding that BIA must inquire about and consider the respondent's explanations for inconsistencies).

Second, the immigration judge relied on a purported inconsistency that Juan testified that he talked to Antonio in the van on the way to the border, but Antonio testified that they did not talk. But it is unclear that there was any inconsistency at all. The government first asked Antonio, "And then you got up and you got in the car?" Antonio said yes. The government then asked if Antonio fell asleep, and he said he was just leaning on the seat. The government asked, "Were you talking to your son?" and Antonio answered, "Pretty much we didn't exchange words." The IJ interpreted this to mean that Antonio and Juan did not speak at all during the entire trip, but instead, this quoted exchange could plausibly suggest that they did not speak much but spoke a little, and it could plausibly refer only to the initial part of the trip when Antonio had just gotten into the van. In fact, Antonio had told Border Patrol that he "got into an argument" with Juan once he discovered Garcia and Rodriguez were in the vehicle, so clearly his statement "Pretty much we didn't exchange words" did not mean they were silent for the full trip. Juan, on the other hand, was not asked the same question—Juan was asked the very general question whether they talked "during the trip," to which he responded yes. Juan did not say how much they spoke, i.e., whether it was only a few words, which would be consistent with Antonio's testimony. And Juan did clarify that they did *not* talk about the smuggling, which is what really matters. The IJ should not have placed significant weight on this apparent discrepancy absent development of the testimony to clarify whether the statements were truly inconsistent. *Shrestha*, 590 F.3d at 1044 (holding that IJ should consider

petitioner's explanation for a perceived inconsistency to "shed[] light on whether there is in fact an inconsistency at all").

Third, the immigration judge noted that Antonio testified that he got into the van after Garcia and Rodriguez, but the IJ said that Antonio's statement at the border was that he was asleep in the van when the women entered the van. The IJ misread Antonio's border statements in the I-213 form. The form says that Antonio stated that he "he was asleep when GARCIA and RODRIGUEZ got into the vehicle." This does not, however, necessarily mean that he was asleep in the *van*. The IJ may have made this assumption from the following sentence in the I-213 form, which indicated that Antonio did not realize the women were in the backseat until he "woke up" when the van was near the border. But Antonio's statement itself says nothing about where he was asleep when the women entered the van.

Indeed, other evidence in the record suggests that Antonio was asleep or otherwise *in the house* when the women got into the van. Juan testified that Antonio was asleep when Garcia arrived at the house, and he explained that when Antonio got in the front seat of the van fifteen minutes later, Antonio did not see the two women already in the backseat. It is clear from context that Juan was saying Antonio was asleep in the house. Micaela testified a little differently, but she was still clear that Antonio was in the house; she stated that when Antonio "got out of his bedroom, he went into the bathroom, and that's when they [Garcia and Rodriguez] got into the car." Antonio's testimony was also consistent on this point; he testified that he was sleeping in the house, and then he "got up and . . . got in the car." We conclude that the IJ's

reading of the I-213 was erroneous, and that there was no inconsistency on the timing of entry at all.

**B**

While the IJ erred in these three respects when determining that Juan and Antonio were not credible, we disagree with Antonio that the IJ erred in the two other respects that Antonio identifies in his brief. One legitimate reason the IJ gave to support the negative credibility determinations—though as to Juan, not Antonio—was that he concluded that Juan and Micaela falsely testified that they were threatened by Border Patrol Officer Lopez with removal of Micaela's children if they did not blame someone. The IJ instead gave dispositive weight to Lopez's testimony that he would "never" make such a threat in any case, although he did not remember this specific case. Substantial evidence supports the IJ's conclusion that Juan's and Micaela's later testimony that they were threatened by Border Patrol was a lie or embellishment. When Juan retracted his statement to Border Patrol in March 2007, he did not say anything about a threat that his mother's children would be taken—he explained only that he had been "afraid what would happen to my two younger sisters and younger brother, if the Immigration detained my mother." He made no suggestion of a threat.

The second valid reason the IJ gave to discredit Juan was that it was suspicious that Micaela and Juan had both testified to the same $1500 smuggling fee even though they claimed that they never spoke about the fee. Substantial evidence supports the IJ's conclusion that Juan was lying that he "invented" this fee amount because it could reasonably seem

that Micaela and Juan had coordinated this aspect of their stories.

## IV

We need not decide whether the three errors by the IJ in his reasoning to discredit Antonio and Juan were sufficient by themselves for us to grant Antonio's petition for review. There is a fundamental contradiction in the IJ's reasoning that leads us to grant Antonio's petition and remand for further explanation.

As explained above, removability for smuggling requires the respondent to have taken an affirmative act in the smuggling attempt. *See Altamirano*, 427 F.3d at 592. The IJ here made no explicit finding that Antonio engaged in any affirmative act—he ruled only that "the Court finds that the father, Antonio Perez-Arceo was aware of the smuggling." The only evidence in the record that could have supported a finding of an affirmative act on Antonio's part is Juan's initial statement to Border Patrol that it was Antonio who made the arrangements to bring Rodriguez and Garcia into the United States. To credit Juan's initial statement would require discrediting Micaela's testimony and I-213 statements, in which she took sole responsibility for the smuggling attempt. It would also require discrediting Juan's later recantation and Antonio's testimony, all of which was consistent with Micaela's testimony and I-213 statements that she alone was responsible.

Far from discrediting Micaela's statements, however, the IJ explicitly relied on them in ordering her removal, holding that "through [Micaela's] testimony and information in the I-213 in her case, the Department of Homeland Security has

met their burden by proving by clear and convincing evidence both the allegations and that charge, and I will sustain both." Yet when it came to Antonio's case, the IJ ignored Micaela's testimony and I-213 stating that she was the sole guilty party and that Antonio "had no idea" she made the smuggling arrangements. The IJ instead found Antonio responsible without explaining this inconsistency at all.

When an IJ makes seemingly inconsistent findings with respect to an adverse credibility determination, it is necessary to remand the record for more factfinding and clarification. Stated another way, absent a sufficient explanation, the IJ in this case could not credit one part of the witness Micaela's testimony to remove her, while at the same time discrediting the same part of her testimony to remove Antonio. *See Shrestha*, 590 F.3d at 1043 (explaining the IJ must give "cogent reasons" for credibility determinations); *Soto-Olarte*, 555 F.3d at 1094 (explaining general rule to remand for further explanation when adverse credibility determination is flawed); *cf.* Arthur R. Miller, 9C Fed. Prac. & Proc. Civ. § 2579 n.9 (3d ed. 2016) ("Factual findings that are internally inconsistent . . . are clearly erroneous.").

In sum, the IJ's conclusion that Antonio was complicit in the smuggling attempt required more than a determination that Antonio and Juan were untruthful in laying sole responsibility on Micaela. The IJ also needed to explain why Micaela's I-213 and testimony were not credible. Instead, the IJ actually credited Micaela's testimony and I-213 in which she took responsibility for the smuggling attempt. A negative credibility determination must be supported by "specific and cogent reasons," *Shrestha*, 590 F.3d at 1042, but the IJ did not give any reasons undermining Micaela's statements that she took responsibility for arranging the smuggling efforts

and procuring false documents. The IJ cannot "cherry pick solely facts favoring an adverse credibility determination while ignoring facts that undermine that result." *Id*. at 1040. The IJ's failure to discuss Micaela's testimony and I-213 and why Micaela was not credible requires us to remand for further explanation.[4]

## V

We grant Antonio's petition for review and remand on an open record for further proceedings in accordance with this opinion. *See Soto-Olarte*, 555 F.3d at 1094–96.

**GRANTED and REMANDED.**

---

[4] The IJ may have thought that all family members knew about the attempt to smuggle Garcia and Rodriguez into the United States. But whether or not the evidence supports this speculation, this finding is insufficient to sustain the charge against Antonio because mere knowledge of the smuggling attempt is insufficient for removability under § 1182(a)(6)(E)(i). *See Altamirano*, 427 F.3d at 592. As mentioned before, the IJ made no explicit finding that Antonio engaged in any affirmative act, instead ruling only that "the Court finds that the father, Antonio Perez-Arceo was aware of the smuggling."